UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHRISTOPHER JACOB,

    Plaintiff,

v.                                                        Case No. 22-C-875

MICHAEL FIELD, et al.,

    Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DISMISSING THIS CASE

Plaintiff Christopher Jacob, a prisoner at Oshkosh Correctional Institution who is representing himself, is proceeding on Eighth Amendment claims against Defendants Michael Field and Dr. Dilip Tannan in connection with care and treatment they provided to Jacob for Attention Deficit Hyperactivity Disorder (ADHD) and hypertension. On June 20, 2023, Dr. Tannan and Field separately moved for summary judgment. Those motions are fully briefed.[1] For the reasons explained in this decision, the Court will grant the motions and dismiss this case.

### BACKGROUND

At the relevant time, Jacob was an inmate at Oshkosh Correctional Institution where Dr. Tannan worked as an internal medicine physician and Field worked as a psychiatric advanced practice nurse prescriber. Dr. Tannan treated Jacob from May 2018 through July 2022 for migraines, headaches, and hypertension. Field treated Jacob from October 2019 through October

---

[1] On December 19, 2023, Jacob filed a motion for leave to file a sur-reply to provide additional documents not included in his response materials. Given Jacob's pro se status, the Court will grant his motion and allow him to file the additional materials.

2022 for psychiatric conditions, including depression, anxiety, and ADHD. Dkt. No. 53 at ¶¶1–6; Dkt. No. 54 at ¶¶1–8.

In 2018, Dr. Tannan began exploring options for addressing Jacob's hypertension. Hypertension is a condition in which one's blood pressure is higher than normal, typically a reading of 140/90 and higher. There may not be any symptoms associated with hypertension, but if left untreated, it can lead to major health conditions such as heart disease and stroke. Dr. Tannan noted that in January 2018 Jacob had been prescribed a stimulant to treat his ADHD. Stimulants can contribute to high blood pressure. Accordingly, Dr. Tannan reached out to Jacob's psychiatry team (Dr. Karl Streinick, Dr. Walters, and Dr. Nikolaus Werner) to ask them to evaluate Jacob's need for stimulants in light of his elevated blood pressure. In November 2018, the team decided to keep Jacob on the stimulant to treat his ADHD. Dkt. No. 54 at ¶¶9–13; Dkt. No. 60 at ¶49.

Specifically, on November 6, 2018, in response to Dr. Tannan's inquiry, Dr. Werner stated that Jacob had been previously tested for ADHD in the community, although he did not have the results. He informed Dr. Tannan how to obtain the results and confirmed that Jacob had had a diagnosis of ADHD for several years while in corrections. He also explained that Jacob reported that his ADHD symptoms were dramatically aggravated during a two-week period when he was off the stimulant. Dr. Werner confirmed that his own observations during that time suggested psychomotor symptoms (bouncing his leg constantly) that were not present when Jacob was taking the stimulant. Finally, Dr. Werner explained that Jacob's so-called "refusals" of his medication occurred on the weekends when Jacob was not working, consistent with Jacob's assertions that he took the stimulant only before working or studying to help him focus. Dkt. No. 35-2 at 12; Dkt. No. 53 ¶20, 23–24, 27.

According to Jacob, for the next two years, his blood pressure remained elevated, although he does not provide specifics, and Dr. Tannan does not state that his elevated blood pressure was

2

of significant concern during that period. Jacob asserts that he suffered headaches, chest pain, and fatigue, but it is not clear if those symptoms resulted from his elevated blood pressure. He asserts that he advised Dr. Tannan of these symptoms. Dkt. No. 58 at ¶¶6–8; 27.

In November 2019, Field, who had taken over Jacob's psychiatric care, received an email inquiring whether Jacob still needed to take a stimulant to treat his ADHD. Field had reviewed Jacob's psychiatric history and noted the absence of records confirming a formal ADHD diagnosis. But he also noted that Jacob had been prescribed a stimulant for "work purposes" to address his ADHD symptoms. On November 19, 2019, Field discussed Dr. Tannan's concerns with Jacob. Jacob explained that he needed to take the stimulant to help him focus and concentrate on his job, which involved translating textbooks to Braille. Jacob explained that the assignments were complicated and required him to study textbooks in his cell while he was not working. Field informed Jacob that he would continue to work with Dr. Tannan to determine whether he should continue taking the stimulant. Dkt. No. 53 at ¶¶8–15; Dkt. No. 54 at ¶¶17–19; Dkt. No. 60 at ¶¶43–45.

On January 23, 2020, Jacob met with Field for a follow-up appointment. Jacob had been working only occasionally since the end of December, so he had not been taking the stimulant on a consistent basis. Field continued to prescribe the stimulant as needed based on Jacob's representations that, even though he was not working consistently, he was still taking courses and studying in his cell. On April 16, 2020, Jacob had another follow-up psych evaluation, at which it was observed that Jacob continued to take the stimulant as needed. It was also observed that Jacob's blood pressure had been elevated since November 2019 (141/89 on November 11, 147/93 on April 9, and 145/92 on April 16). Field continued the treatment plan of Jacob taking the stimulant prior to work, or, as Jacob characterizes it, as needed, but Field again advised Jacob on the possible association between taking stimulants and hypertension. Dkt. No. 53 at ¶¶19–27.

Jacob next met with Field on June 29, 2020, at which time Jacob informed Field that his hours were being reduced because of the pandemic and that he may quit to find a new job. Jacob continued to take the stimulant when he worked and studied. On November 5, 2020, Dr. Tannan again emailed Field and expressed concern about Jacob taking a stimulant given his hypertension. Dr. Tannan recommended that the stimulant be discontinued. Field met with Jacob the following day and conveyed Dr. Tannan's concerns. Jacob informed Field that he had not worked since August 2020. He also informed Field that he continued to take the stimulant to help him study for his class and to help him focus while writing. Field explains that, based on Dr. Tannan's recommendation, Jacob's elevated blood pressure, his history of hypertension, and the fact that Jacob was no longer working, he discontinued Jacob's prescription for a stimulant. Jacob asserts that he advised Field he needed the stimulant to help him study. He also asked Field to prescribe him something else to treat his ADHD symptoms, but, according to Jacob, Field advised him that he would not receive any further treatment for his ADHD symptoms. Dkt. No. 53 at ¶29–36; Dkt. No. 54 at ¶¶17–21; Dkt. No. 60 at ¶¶50–54.

The next day, on November 6, 2020, Dr. Tannan saw Jacob for a dressing change due to an excision of a skin lesion. Jacob was upset about the discontinuation of the stimulant and stated that he was going to stop taking all medications, including his blood pressure medication. Dr. Tannan saw Jacob about a month later, at which time his blood pressure was high (166/108). Dr. Tannan strongly advised Jacob to restart his blood pressure medication and to consult with psychological services about his psychiatric medications. A week later, on December 12, 2020, Jacob was seen in health services for complaints of dizziness and headaches. Jacob's blood pressure was again high (164/102). Jacob stated that he was taking his medications, but it was discovered he was not taking them as ordered. Nursing staff again provided Jacob with instructions regarding his medication. Dkt. No. 54 at ¶¶22–25.

4

Case 1:22-cv-00875-WCG   Filed 01/25/24   Page 4 of 14   Document 65

A few days later, on December 17, 2020, Dr. Tannan again saw Jacob for his blood pressure, which remained high (167/108). Dr. Tannan suggested the use of a diuretic, but Jacob refused. Diuretics are typically the first medication used to treat hypertension. They help the body eliminate excess water and salt by increasing urine output, which decreases the fluid load on the heart. Dr. Tannan decided to add a beta blocker, which causes the heart to beat more slowly and with less force, and to switch Jacob's blood pressure medications to staff controlled so he could confirm Jacob was taking his medications properly. He also ordered routine labs. Dkt. No. 54 at ¶¶22–33.

Jacob signed refusals for his blood pressure medications on January 23–28, 2021, and February 2 and 4, 2021. On February 4, 2021, Dr. Tannan saw Jacob for a follow-up. His blood pressure was still high (167/108). Jacob was still upset over the discontinuation of the stimulant. He informed Dr. Tannan that he would take his blood pressure medication only if they were keep on person, rather than staff controlled. Dr. Tannan explains that he felt compelled to switch Jacob's medication to keep on person as an incentive. Dkt. No. 54 at ¶¶36–38.

On February 11, 2021, Jacob had a follow-up visit with Field, at which time he notified Field that his blood pressure was still high despite having stopped the stimulant in November. Field noted that, based on medical records, Jacob had been regularly refusing his blood pressure medication. Jacob also informed Field that he had returned to work and was having difficulty getting tasks done. According to Field, Jacob appeared preoccupied with resuming a stimulant. He decided to consult with Jacob's providers to get feedback on Jacob's day-to-day functioning in the work and classroom setting. Dkt. No. 53 at ¶¶39–46.

On February 15, 2021, Field received an email from Dr. Kristjana Rahn, who had completed a file review of Jacob's diagnosis and treatment for ADHD. She noted that, based on her review, she was "okay" with discontinuing the stimulant. That same day, Dr. Tannan noted

5

that Jacob had elevated blood pressure readings while he was on a stimulant even though he was taking his blood pressure medication. He stated that, "[f]rom a medical aspect [he] would not recommend stimulants for [Jacob]." In Field's opinion, there was no overwhelming clinical evidence that would support an ADHD diagnosis or continued treatment for ADHD. Dkt. No. 36-11; Dkt. No. 53 at ¶¶47–50.

Jacob was next seen in health services on April 3, 2021, for complaints of chest pain. He was evaluated by Dr. Tannan a few weeks later, on April 20, 2021. Jacob informed Dr. Tannan that he was taking his blood pressure medications, but Dr. Tannan had no way of confirming Jacob's statements. His blood pressure remained high (152/98). Jacob refused Dr. Tannan's recommendation that he take metoprolol or try a diuretic, but he agreed to try a different blood pressure medication. A week later, on April 28, 2021, Dr. Tannan saw Jacob again. Jacob reported unpleasant side effects with the new medication, including feeling weak and tired. Jacob refused to take the beta blocker and the new blood pressure medication, so Dr. Tannan prescribed a different medication. Dr. Tannan also switched his medication back to staff control to ensure medication compliance. Dkt. No. 54 at ¶39–41.

Dr. Tannan saw Jacob for follow-up appointments in June and August, at which time his blood pressure was lower but still elevated (134/83). On September 16, 2021, Dr. Tannan requested that Field evaluate Jacob and consider starting him on Clonidine or Guanfacine for possible mental health issues and management of his blood pressure and headaches. Field consulted with Dr. Kate Keshena, who noted Jacob's uncontrolled hypertension and indications that he was not taking his medications consistently. She stated that stimulants were contraindicated and also suggested Clonidine and Guanfacine. Jacob indicated he was interested in trying Clonidine, but a couple months later, on November 2, 2021, he refused to take it, noting that it made him tired and was not helping with his anxiety, depression, or attention issues. On November

19, 2021, Jacob started Guanfacine, but he refused to take it a few days later because he had serious side effects, including tiredness, tingling and numbness, and a swollen tongue. Dkt. No. 54 at ¶¶47–52; Dkt. No. 53 at ¶¶51–65.

On November 30, 2021, Tannan saw Jacob to discuss his blood pressure and headaches. Jacob claimed his blood pressure was high due to the food served by the institution. Dr. Tannan reviewed Jacob's canteen orders and noticed that he ordered foods high in sodium such as potato chips, ramen, and sausages. According to Dr. Tannan, he told Jacob to self-select low sodium foods and to not add salt to his foods. Dr. Tannan also reviewed Jacob's medication charts and noted he had not taken his blood pressure medication for eight days. Dr. Tannan learned that, while Jacob had been requesting refills of his other medication, he had not requested refills of his blood pressure medication. Given Jacob's canteen purchases and his noncompliance with his medication, Dr. Tannan believed it would be futile to place Jacob on a low sodium diet. Jacob asserts that Dr. Tannan never told him to change his food purchases. Dkt. No. 54 at ¶¶53–57.

On January 27, 2022, Field had a follow-up psych appointment with Jacob, who described himself as hopeless because of the disagreement over his treatment plan. Field believed that Jacob was unreliable and deceptive in reporting his symptoms; he also noted Jacob's noncompliance with his treatment plan. Field reviewed psychological reports by other doctors who treated Jacob and indicated he had "a strong oppositional behavior with attitudes of superiority and entitlement" and diagnosed him with "personality disorder with schizoid, narcissistic, and antisocial features along with obsessive-compulsive disorder." Dkt. No. 53 at ¶¶70–80.

On May 10, 2022, Dr. Tannan evaluated Jacob for the last time. His blood pressure was still elevated (133/87). Dr. Tannan notes that at no time did he believe it was necessary to refer Jacob to a specialist because Jacob never presented with other conditions that would have warranted specialist intervention. Dr. Tannan states that he routinely ordered metabolic panel labs

7

and EKGs to monitor Jacob's health, and he did not see any concerns that would suggest Jacob should see a cardiologist or specialty provider. Dkt. No. 54 at ¶¶59–62.

Jacob was seen by Field on May 24, 2022, for a follow-up psych evaluation. Jacob complained of continued heightened anxiety. Field asserts that, when he asked Jacob about various possible treatments, Jacob responded, "If I can't have a stimulant, I don't want any changes." When Field suggested a follow-up appointment, Jacob responded, "Don't bother." Field asserts that Jacob abruptly left his office and refused additional psychiatric evaluations. On October 31, 2022, Field sent a letter to Jacob documenting his treatment non-compliance. Dkt. No. 53 at ¶¶84–93.

According to Jacob, he began to have a mental health crisis after his ADHD medication was discontinued, including thoughts of suicide and self-harm. He notes that the treatment he now receives for his hypertension (following Dr. Tannan's departure) has been effective and has significantly reduced his headaches, fatigue, and chest pain. Dkt. No. 60 at ¶¶29–31; 55–60.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). In response to a properly supported motion for summary judgment, the party opposing the motion must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary

8

judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**ANALYSIS**

Jacob asserts that Dr. Tannan and Field violated the Eighth Amendment because their treatment decisions demonstrated deliberate indifference to Jacob's hypertension and ADHD symptoms. The Court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment; it asks: 1) "whether a plaintiff suffered from an objectively serious medical condition" and 2) "whether the individual defendant was deliberately indifferent to that condition." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016)).

Defendants do not dispute that Jacob's hypertension constitutes an objectively serious medical condition, nor do they dispute that ADHD *may* constitute an objectively serious medical condition. However, Field disputes that Jacob has ADHD. Given Jacob's sworn statements that he was diagnosed with ADHD in the community, had that diagnosis for several years while incarcerated, and was prescribed medication for several years to treat ADHD symptoms, a jury could reasonably conclude that Jacob has ADHD and that the symptoms he experiences as a result of that condition are objectively serious. Accordingly, the Court's analysis will focus on whether a jury could reasonably conclude that each Defendant was deliberately indifferent to Jacob's conditions.

1. **No Jury Could Reasonably Conclude that Dr. Tannan Was Deliberately Indifferent to Jacob's Hypertension.**

Dr. Tannan explains that stimulants may impact a person's blood pressure and therefore should not be prescribed to a person with hypertension. In light of Jacob's consistently elevated

blood pressure and history of hypertension, Dr. Tannan asked Jacob's team of psychiatrists whether he needed to be prescribed a stimulant to treat his ADHD symptoms. The team explained their rationale for continuing the stimulant at that time, but after time passed and Jacob's blood pressure remained elevated despite him taking his blood pressure medications, Dr. Tannan again inquired whether Jacob taking a stimulant was the appropriate method for treating Jacob's ADHD symptoms.

No jury could reasonably conclude that Dr. Tannan was deliberately indifferent to Jacob's medical conditions merely because he again inquired whether the stimulant could be discontinued. Jacob offers no evidence rebutting Dr. Tannan's assertions that taking a stimulant is not advised for patients with hypertension. The fact that he asked Jacob's mental health providers to consider the necessity of prescribing a stimulant given the potential impact on Jacob's blood pressure (a much more significant concern than Jacob's ability to focus) is not a demonstration of deliberate indifference. In fact, Dr. Tannan's concern about the stimulant's impact on Jacob's hypertension demonstrates his concern about Jacob's overall health and is an example of his efforts to address Jacob's condition.

Nor could a jury reasonably conclude that Dr. Tannan was deliberately indifferent to Jacob's hypertension after Field discontinued the stimulant. Dr. Tannan made numerous attempts to control Jacob's blood pressure after Field discontinued the stimulant, including trying new medications, adjusting the manner in which Jacob's medications were administered, recommending a diuretic and beta blockers, and suggesting other medications to treat his mental health conditions. Jacob fought Dr. Tannan every step of the way, making it clear that he would cooperate only if his prescription for a stimulant were reinstated. But an inmate is not entitled to demand specific care or the best care possible; an inmate is entitled to reasonable measures to address a substantial risk of harm. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

Jacob asserts that he suffered a mental health crisis after the stimulant was discontinued, but regardless of why Jacob refused to cooperate, the record is clear that Dr. Tannan made numerous efforts to address the risk to Jacob's health.

Jacob also highlights that Dr. Tannan refused to place him on a low-sodium diet or refer him to a specialist. But Jacob fails to appreciate why Dr. Tannan refused Jacob's requests. Canteen records showed that Jacob regularly ordered high-sodium foods such as potato chips and sausage. Dr. Tannan explains that, given these food choices and Jacob's refusal to comply with recommendations, it would have been futile to order a low-sodium diet. Dr. Tannan also explains that he ordered multiple labs and tests, all of which were within normal ranges, so care by a specialist was not warranted. Jacob's uncontrolled blood pressure was a consequence of his own poor choices—refusing to try recommended treatments, refusing to take his medication as ordered, and refusing to take his medication consistently. A different diet or a visit to a specialist would not have remedied Jacob's obstinance.

In sum, no reasonable jury could conclude that Dr. Tannan failed to make reasonable efforts to address Jacob's hypertension. Dr. Tannan is therefore entitled to summary judgment.

**2. No Jury Could Reasonably Conclude that Field Was Deliberately Indifferent to Jacob's ADHD.**

Because Jacob had not been working for months, was only occasionally taking the stimulant when he studied in his cell, and had persistently elevated blood pressure, Field decided to follow Dr. Tannan's recommendation to discontinue the stimulant in an attempt to control Jacob's blood pressure, which was of much greater concern than Jacob's difficulty focusing while studying. The record demonstrates that Field carefully considered Dr. Tannan's recommendation, including seeking the input of other mental health providers and discussing the recommendation with Jacob. The mere fact that Jacob disagreed with Field's decision (or even that other providers

may have disagreed with Field's decision) is insufficient to show that Field acted with deliberate indifference to Jacob's ADHD. Field made a deliberate decision to treat Jacob in a particular manner. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). Accordingly, the Court must defer to Field's decision unless "no minimally competent professional would have so responded under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Given that other providers later agreed that a stimulant was contraindicated to treat Jacob's ADHD because of his hypertension, no jury could reasonably conclude that no minimally competent professional would have responded as Field responded to Dr. Tannan's recommendation.

Nor does Jacob create a triable issue regarding whether Field's initial refusal to prescribe anything for Jacob's ADHD symptoms demonstrated deliberate indifference to Jacob's condition. Field explains that Jacob's diagnosis and long-term prescription for a stimulant was based almost solely on Jacob's self-reporting of his symptoms. Field notes that he believed Jacob to be exaggerating and/or lying about his symptoms. Further, Jacob reported that he required the stimulant before work, yet he had been out of work for months without informing Field. Jacob therefore no longer had a documented need for the stimulant, but rather only a preference for the stimulant, which he desired to use at his convenience. Field explains that, given Jacob's consistently high blood pressure and the fact that Jacob was no longer working, he agreed with Dr. Tannan's recommendation to discontinue the stimulant. Again, Jacob wanted his providers to prioritize his ability to focus over his blood pressure, but his disagreement with their decision to prioritize his blood pressure is not a sufficient basis for liability.

Further, Jacob highlights that Field refused to prescribe anything in place of the stimulant, but this ignores Jacob's insistence that he would be content only if Field reinstated the stimulant. At the recommendation of other providers, Field eventually prescribed two different medications in an effort to address Jacob's symptoms, but Jacob took both for only a short time, complaining

that they did not work or that they caused unbearable side effects. He also told Field that if he was not going to prescribe a stimulant, he was not interested. Given Jacob's focus on being prescribed only a stimulant (which multiple providers found to be contraindicated), he was not harmed by Field's failure to offer alternatives.

Jacob also highlights that his blood pressure remained elevated even after Field discontinued the stimulant. But, again, Jacob ignores that during that time he was not consistently taking his blood pressure medications. Thus, Field could not accurately assess the stimulant's impact on Jacob's blood pressure. Had Jacob complied with Dr. Tannan's treatment plan, Field would have been better positioned to determine what, if any, impact the stimulant had on Jacob's blood pressure. It was Jacob's unruly and obstinate refusals to comply with Dr. Tannan's treatment plan that deprived Field of the opportunity to determine whether a stimulant could be safely prescribed, not Field's deliberate indifference to Jacob's condition.

In short, because no jury could reasonably conclude that Field demonstrated deliberate indifference to Jacob's mental health condition when he discontinued the stimulant in an effort to address Jacob's high blood pressure, Field is entitled to summary judgment.

Finally, on January 9, 2024, Jacob filed a motion for a preliminary injunction asking the Court to order Field to medicinally treat him for ADHD. Dkt. No. 63. Given that Defendants are entitled to summary judgment on Jacob's claims, the Court will deny Jacob's motion for injunctive relief.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' summary judgment motions (Dkt. Nos. 32, 37) are **GRANTED**. The case is dismissed. The Clerk of Court will enter judgment accordingly.

**IT IS FURTHER ORDERED** that Jacob's motion for leave to file a sur-reply (Dkt. No. 61) is **GRANTED**. The Clerk is directed to detach and e-file the sur-reply (Dkt. No. 61-1).

**IT IS FURTHER ORDERED** that Jacob's motion for a preliminary injunction (Dkt. No. 63) is **DENIED**.

Dated at Green Bay, Wisconsin this 25th day of January, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

---

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.